1998 OK CR 69

**Kevin Boyd WHITE, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–96–1326.

Court of Criminal Appeals of Oklahoma.

Dec. 29, 1998.

Joe P. Robertson, James Bowen, Oklahoma Indigent Defense System, Capital Trial Division, Tulsa, for Appellant.

Clint M. Ward, Assistant District Attorney, Vinita, for the State.

Jamie D. Pybas, Oklahoma Indigent Defense System, Capital Direct Appeals, Norman, for Appellant.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, for Appellee.

## OPINION

STRUBHAR, Vice–Presiding Judge.

¶ 1 Kevin Boyd White, hereinafter Appellant, was tried by jury and convicted of Murder in the first degree (21 O.S.1991, § 701 .7(A)), in the District Court of Craig County, Case No. CF–95–14, the Honorable James D. Goodpaster, District Judge, presiding. The jury recommended death after finding four aggravating circumstances[1] and the trial court sentenced Appellant accordingly. From this Judgment and Sentence, he appeals.[2]

## FACTS

¶ 2 On February 4, 1995, Appellant beat to death fellow inmate Donald Iwanski at the Northeast Oklahoma Correctional Center [hereinafter NEOCC] over a twenty dollar debt. The contested issue at trial was whether Appellant beat Iwanski to death with malice aforethought or while in a state of voluntary intoxication.

¶ 3 Three inmates testified they saw Appellant get on the "chow" bus after dinner and ride to Building 14 where Iwanski lived.

Appellant entered the building with a pipe in his sleeve, went to Iwanski's bunk and beat Iwanski delivering several blows. After the beating, Appellant put the pipe in his sleeve and walked toward the exit. As he reached the exit, he averted his face from the guard station and placed the pipe in a bathroom that was under construction. One of the inmates testified Iwanski told him on the day of the homicide that he was afraid that if he did not repay the debt, he would be "taken out." All three inmates stated that Appellant was not stumbling, staggering, weaving or swaying and that Appellant did not have slurred speech. Deputy Sherriff Eddie Griffin, O.S.B.I. Agent Rick Stephens, and the bus driver, NEOCC Officer Randy Burke, testified that Appellant spoke clearly and did not appear intoxicated when they saw him around the time of the homicide.

¶ 4 Appellant took the stand and testified that in the days preceding the homicide, as well as on the day of, he had been ingesting valium and drinking vodka. Appellant said on the day of the homicide, he took six valium tablets after lunch and consumed more vodka. Appellant remembered being at the dining hall and waiting for Iwanski after dinner so he could get the money he was owed. He remembered being in Building 14, walking down the aisle to Iwanski's bunk, swinging the pipe and landing the initial blow. Appellant claimed he did not remember eating dinner, the bus ride to Building 14, having the pipe in his possession, delivering the blows after the first one or disposing of the pipe. Appellant testified that he had suffered memory loss in the past when he was abusing drugs and alcohol and that when he committed past crimes he was severely intoxicated. Appellant claimed that he did not intend to kill Iwanski, but only intended to go there to get paid.

---

1. 1) The defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) The murder was especially heinous, atrocious, or cruel; 3) The murder was committed by a person while serving a sentence of imprisonment on conviction of a felony; and 4) The existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(1), (4), (6) and (7).

2. Appellant's Petition in Error was filed in this Court on April 18, 1997. Appellant's brief was filed November 18, 1997, and the State's brief was filed March 18, 1998. A reply brief was filed on April 7, 1998. The case was submitted to the Court on March 26, 1998. Oral argument was held July 21, 1998.

¶ 5  In his first proposition of error, Appellant claims the trial court committed reversible error by refusing to allow the defense to present its mental health expert in the first stage of trial to support his voluntary intoxication defense.  Because we must agree with Appellant that the trial court abused its discretion in prohibiting the mental health expert's testimony, this case must be reversed and remanded for a new trial and this Court will not reach the merits of the other claims raised by Appellant.

¶ 6  Shortly before trial, the defense retained Dr. Phillip Murphy, a licensed clinical psychologist, to examine Appellant and offer evidence in support of Appellant's voluntary intoxication defense.  Ten days prior to trial the defense filed a notice of its intent to call Dr. Murphy with a brief summary of his proposed testimony.[3]  Thereafter, the State filed a motion *in limine* to exclude Dr. Murphy's testimony from the first stage of trial based on *Hooks v. State*, 1993 OK CR 41, ¶ 16, 862 P.2d 1273, *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994).  At trial, the State argued that it did not receive adequate notice of Dr. Murphy's proposed testimony because it did not receive a report of Dr. Murphy's findings.[4]  Further, the State re-urged that Dr. Murphy was prohibited from giving an opinion on Appellant's intent to kill based on *Hooks*.  The trial court reserved its ruling until the defense announced its intention to call Dr. Murphy, but noted it would hold an *in camera* hearing to determine the extent to which Dr. Murphy would be allowed to testify if the defense elected to call him during first stage.  After the State rested, defense counsel renewed the request to call Dr. Murphy in the first stage of trial and made an offer of proof.  The trial court ruled Dr. Murphy would not be allowed to testify in the first stage of trial because the State had not been provided adequate notice of Dr. Murphy's proposed testimony and because Dr. Murphy's opinion was prohibited by *Hooks*.  Because defense counsel objected to the exclusion of Dr. Murphy's testimony and made an offer of proof, we are satisfied under the unique circumstances of this case that the issue has been properly preserved for review.[5]

---

3.  The summary provided:

> Dr. Murphy will testify that he administered an in depth psychological evaluation of the Defendant, Kevin White, consisting of interviews with the Defendant, collateral sources and other information; that he conducted a number of tests with the Defendant during this evaluation, consisting of: The Bender–Gestalt Test; Hand Test; Wexler Memory Scale; Memory for Designs; Rorshach Test; Millon Clinical Multi Axial Inventory III; Clinical Analysis Questionnaire; Trails A & B; Finger Agnosia Test; Fingertip Number Writing Test; Bilateral Strength of Grip Test; Category Test; Finger Tapping Test; and Adult Neuropsychological Questionnaire.
>
> Dr. Murphy will explain the fundamentals of the above tests as they relate to the evaluation of the Defendant; the purpose and substance of the above tests as related to the Defendant; neuropsychological indicators the tests target; and analysis and conclusions based upon the results of those tests as related to the Defendant.
>
> Dr. Murphy will testify that from this battery of tests, he developed a neuropsychological profile of the Defendant, based upon indicators relating to chronic and acute alcohol and substance abuse, and potential neurological and neuropsychological injuries which negatively effect the Defendant's ability to form and engage in knowledgeable acts with specificity and control.  (O.R.230–31)

4.  The State did not receive a report from Dr. Murphy because Dr. Murphy did not prepare one.  Dr. Murphy was retained by appointed counsel after private counsel refused to go to trial, was held in contempt and withdrew.  (O.R. 171) Prior to his withdrawal, private counsel had applied for and obtained funds from the Oklahoma Indigent Defense System to employ a mental health expert to evaluate Appellant.  (O.R. 102, 108–116) Appointed defense counsel was unable to obtain information from the previous psychologists hired by Appellant's private attorney because the psychologists had not been paid in full.  (O.R. 194–197; Tr.23–25) Appointed defense counsel obtained limited additional funds to hire Dr. Murphy.  (Tr. 23–25) Dr. Murphy was hired with the understanding that funds were available for an evaluation but not for a detailed report concerning his findings.  According to defense counsel, Dr. Murphy was available for interview by the prosecution prior to trial and such claim was not contested by the State.  (Tr. 23–25)

5.  We believe it would have been prudent for defense counsel to have renewed his request to call Dr. Murphy and to have made a more detailed offer of proof after the defense put on its witnesses to establish Appellant's intoxication so that the trial court could have better understood how Dr. Murphy's testimony would have supported Appellant's defense of voluntary intoxication.  However based on this record, counsel's

¶ 7 The issue to resolve is three-fold: (1) Did defense counsel violate the trial court's discovery order by not producing a report of Dr. Murphy's opinion when no report existed; (2) If there was a discovery violation, was the sanction imposed too severe, i.e. was Appellant prejudiced by the exclusion of Dr. Murphy's testimony; and (3) Was Dr. Murphy's opinion prohibited by *Hooks*.

¶ 8 This Court must determine first whether the criminal discovery code, 22 O.S.Supp.1996, §§ 2001 and 2002, requires all mental health experts to issue reports of their opinions to comply with the notice provisions of the discovery code.[6]

¶ 9 Title 22 O.S.Supp.1996, § 2002(B)(1)(c) provides:

1. Upon request of the state, the defense shall be required to disclose the following:

c. the names and addresses of any witness the defendant will call, other than himself, for testimony relating to any mental disease, mental defect, or other condition bearing upon his mental state at the time the offense was allegedly committed, together with the witness' statement of that fact, if the statement is redacted by the court to preclude disclosure of privileged communications.

¶ 10 This Court must determine if the language "together with the witness' statement of that fact" in section 2002(B)(1)(c) requires a report to be made and produced any time a defendant intends to call a mental health witness or whether it only requires defense counsel to file a summary stating the mental health witness' opinion. The plain language of section 2002(B)(1)(c) appears to require defendants to provide a report or statement from the actual witness setting forth the witness' opinion. If defense counsel could satisfy section 2002(B)(1)(c) by producing a summary of the mental health witness' testimony, there

would be no need for the redaction of privileged communication because a defense attorney would not include privileged communication in a summary. This interpretation is further bolstered by looking at section 2002(B)(1)(a) which requires defendants to provide the State with the relevant, written or recorded statements **if any** of the witnesses the defense intends to call. Section 2002(B)(1)(c) presupposes the mental health witness will issue a statement or report since it does not contain the "if any" language of section 2002(B)(1)(a).

¶ 11 We realize this holding could create a hardship on indigent defendants. Oftentimes as in this case, indigent defendants have funds only for an evaluation and consequently there is no report to produce because one was not made. This budgetary issue is a matter left to the Oklahoma Indigent Defense System which must allocate the monies it receives from the Legislature prudently to ensure that indigent defendants may comply with the criminal discovery code.[7] Requiring defendants to provide a mental health witness' report fulfills the legislative purpose of the criminal discovery statute which is to provide notice and eliminate "trial by ambush" tactics. Accordingly, we find that section 2002(B)(1)(c) requires mental health witnesses to issue statements or reports for production and that Appellant, although not deliberately, did violate the trial court's discovery order by not providing the State with a report from Dr. Murphy even though no report existed.

¶ 12 The issue now becomes whether the exclusion of Dr. Murphy's testimony was too severe a sanction for this discovery violation. The right of the accused to confront the prosecution's witnesses and to present his own witnesses to establish a defense is a fundamental element of due process of law. *Washington v. Texas*, 388

---

actions adequately preserved this issue for review.

6. The State filed a motion to produce based on 22 O.S.Supp.1996, § 2002. (O.R.81) The trial court sustained the State's motion to produce "in so far as it complies w/ statute & Allen ruling." (O.R.83)

7. There is no excuse in this case that $3,000.00 of OIDS monies was essentially wasted in payments to mental health experts who conducted an evaluation of Appellant for private counsel and who refused to provide their information to appointed counsel because they had not been paid in full.

U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). Although the criminal discovery code provides for exclusion of evidence as a sanction for non-compliance, this Court has found in several capital cases that the exclusion of a defense witness was "too severe a sanction." *See Allen v. State,* 1997 OK CR 44, ¶ 11, 944 P.2d 934, 937. *See also Wisdom v. State,* 1996 OK CR 22, ¶ 44, 918 P.2d 384, 396; *Morgan v. District Court of Woodward County,* 1992 OK CR 29, ¶ 8, 831 P.2d 1001, 1005. In so finding the *Allen* court noted the Sixth Amendment Compulsory Process Clause could be violated by excluding a material defense witness as a sanction for a discovery violation. *Allen,* 1997 OK CR 44, ¶ 11, 944 P.2d at 937. "Excluding a material defense witness is appropriate only where the discovery violation is 'willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence.'" *Id.* (quoting *Taylor v. Illinois,* 484 U.S. 400, 415, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988)). Where the discovery violation is not willful, blatant or calculated gamesmanship, alternative sanctions are adequate and appropriate. *See Allen,* 1997 OK CR 44, ¶ 11, 944 P.2d at 937.

¶ 13 In the instant case, the record shows that the trial court did not consider the alleged discovery violation willful. Nor can Appellant's failure to produce a report under these circumstances support a finding that such failure was done to gain a tactical advantage to minimize the effectiveness of the State's cross-examination of Dr. Murphy or to hinder the State's ability to produce rebuttal evidence. The record clearly shows the prosecutor anticipated Appellant's voluntary intoxication defense because he questioned all witnesses about Appellant's sobriety. Further, the State's rebuttal witness testified that although Appellant smelled of alcohol, he appeared sober. The State was well prepared to contest any evidence that Appellant was intoxicated at the time of the homicide to an extent that his mental abilities were so overcome that he could not form the requisite intent to kill.

¶ 14 This Court is acutely aware the adversary process could not function effectively without adherence to rules of discovery and procedure that govern the orderly presentation of facts and arguments that provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. However, excluding Dr. Murphy's testimony in the first stage of trial denied Appellant the ability to present the foundation of his voluntary intoxication defense and the prejudicial impact is plain. Appellant established, if believed, that he was intoxicated after he ingested six valium tablets and drank vodka the afternoon preceding the homicide. He further testified that he never intended to kill Iwanski and that he could not remember significant portions of the evening of the homicide. Dr. Murphy would have explained the second component of the voluntary intoxication defense, i.e. how Appellant's intoxication affected his mental state and prevented him from forming malice aforethought. Such evidence is critical to establish the defense of voluntary intoxication.

¶ 15 Although Dr. Murphy's opinion would have embraced an ultimate issue to be decided by the trier of fact, it was not prohibited by *Hooks.* The *Hooks* court held that a mental health expert could not render an opinion on a defendant's intent to kill unless the opinion related to a cognizable defense such as insanity. *Hooks,* 1993 OK CR 41, ¶ 16, 862 P.2d at 1279. Voluntary intoxication has long been recognized as a defense to the crime of First Degree Malice Murder. *E.g., Cheadle v. State,* 11 Okl.Cr. 566, 149 P. 919 (1915). Dr. Murphy should have been free to suggest the inferences the jury should draw from the application of his specialized knowledge to the facts of this case as long as he refrained from merely telling the jury what result to reach. *See Cannon v. State,* 1998 OK CR 28, ¶ 18, 961 P.2d 838, 846; *Romano v. State,* 1995 OK CR 74, ¶ 21, 909 P.2d 92, 109, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996). Such opinion evidence is admissible because it assists the trier of fact to understand the evidence and determine a fact in issue and its probative value is not substantially outweighed by the danger of unfair prejudice. *See Cannon,* 1998 OK CR 28,

¶20, 961 P.2d at 846; *Romano,* 1995 OK CR 74, ¶22, 909 P.2d at 109–110, *Hooks,* 1993 OK CR 41, ¶13, 862 P.2d at 1279. Because Dr. Murphy's opinion was admissible and material to the issues at trial and there was no willful discovery violation, we find the trial court's exclusion of Dr. Murphy's testimony in the first stage of trial constitutes reversible error. *Allen,* 1997 OK CR 44, ¶¶11–12, 944 P.2d at 937. Accordingly this case is reversed and remanded to the District Court for a new trial.

CHAPEL, P.J.: Concurs in result.

LUMPKIN, J.: Specially Concur.

LANE, J., and JOHNSON, J.: Concur.

CHAPEL, P.J., CONCURRING IN RESULT:

¶1 I concur in the majority decision to reverse and remand this case for a new trial. I cannot, however, agree with the analysis of Title 22 O.S.Supp.1996, § 2002(B)(1)(c). I believe the statute requires a defendant to disclose reports or statements *only* if they exist. I do not believe we can, or should, require a written report from every mental health witness.

LUMPKIN, JUDGE: SPECIALLY CONCUR

¶1 I concur in the Court's decision in this case, but do so more on the facts not stated in the opinion than the facts which are stated. In addition, I believe the Court's analysis of the revisions of the Oklahoma Criminal Discovery Code are accurate in both the interpretation of the language of the statute as well as the Legislative intent relating to the Discovery Code.

¶2 This case is a vivid example of why this Court needs to promulgate objective criteria for trial judges to utilize in evaluating the necessity of giving an instruction on a defendant's theory of defense. *See Jackson v. State,* 964 P.2d 875 (Okl.Cr.1998) (Lumpkin, J. concurring in result). As I stated in *Jackson,* "by establishing clear, objective criteria in our analysis of issues on appeal, we provide the helpful guidance trial practition-

ers and judges deserve. At the same time, we discipline ourselves by providing a consistent method for reviewing the cases which come before us on appeal". *Id.* at 902. The issue here is not whether the defendant can present his defense, but whether he is entitled to a jury instruction on that defense. "[B]efore a defendant is entitled to an instruction on the defense . . ., he must establish a *prima facie* case of the . . . elements of that defense." *Michigan v. Lemons,* 454 Mich. 234, 562 N.W.2d 447, 454 (1997). *Prima facie* evidence is defined as:

Evidence good and sufficient on its face. Such evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient . . . to sustain a judgment in favor of the issue which it supports.

*Id.* at not. 20. *See also Jackson,* 964 P.2d at 901–2.

¶3 If I were to apply the procedure I suggested in *Jackson* to the limited facts set out in the opinion, I would find the trial judge correctly denied the request for the voluntary intoxication instruction and the testimony of Dr. Murphy in the first stage of the trial. The reason for that is, based on the facts related in the opinion, I would find Appellant failed to present sufficient competent evidence to support his defense and to warrant a jury instruction on that defense.

¶4 The opinion gives the impression that the only evidence supporting the defense of voluntary intoxication was Appellant's statement that he had consumed alcohol and taken valium. However, that is not the fact situation the record presents. In addition to Appellant's statement, the defense attempted to offer the testimony of a fellow inmate, Michael Coffman, and did present the evidence of another inmate, Darren Wasserman. Appellant's self-serving statements, when coupled with the testimony of these two inmates, does establish competent evidence for the trier of fact to make a decision relating to the believability between Appellant's evidence and the conflicting evidence presented by the State.

¶ 5 To establish his defense of voluntary intoxication, Appellant called inmate Darrin Wasserman, who testified Appellant took valium and drank vodka on the day of the homicide. However, on cross-examination, Wasserman conceded he did not actually see Appellant ingest the valium or drink the vodka. Wasserman did estimate Appellant had been drunk for four or five days preceding the homicide because he was staggering and said he was trying to stay away from Appellant because he did not want to get into trouble. In addition, Wasserman said he saw Appellant at the dining hall just prior to the homicide, but he did not have contact with him at that time.

¶ 6 On the Friday before trial began on Monday, defense counsel received a letter from inmate Michael Coffman saying he had information concerning Appellant's case. Appellant's defense counsel at trial advised the court prior to jury selection that he had given Coffman's name and address to the State and had filed for a writ to have Coffman transported back to Craig County. Defense counsel further advised the court he had not been able to interview Coffman to know whether he would be a viable witness, but informed the court at that time if it developed that Coffman had relevant testimony, he would call him as a witness. At that time the State moved *in limine* to exclude Coffman's testimony due to the failure to list the witness at an earlier date, but at the same time acknowledged it was not defense counsel's fault. The court issued the writ and had Coffman transferred to Craig County to allow the parties an opportunity to interview him to determine the relevancy of his testimony. Upon Coffman's return to Craig County, both the State and the defense had the opportunity to interview him. At the time the State rested its case, defense counsel announced his intent to call Coffman as a witness to support Appellant's voluntary intoxication defense. The offer of proof submitted by defense counsel stated that Coffman would testify that he had dinner with Appellant the day of the homicide and that Appellant was very intoxicated. Coffman would also testify that Appellant had been drinking three days prior to the homicide. The court was also advised that Coffman had

not come forward earlier because he was transferred from NEOCC shortly after the homicide and did not know who to contact until he saw a writ issued to another inmate at his current facility to testify at Appellant's trial. The prosecutor agreed with the offer of proof and also added that Coffman had admitted that he was a good friend of Appellant. The State objected to the defense calling Coffman, stating "the indicia of reliability [of his testimony] is very suspect". The trial court reserved its ruling until the defense presented most of its witnesses. The trial court then ruled that Coffman would not be allowed to testify in the first stage of trial because of the lateness of the notice and because it did not believe Coffman was a credible witness whose testimony would affect the proceedings.

¶ 7 It is readily apparent from the offer of proof, and the State's acknowledgement of it, that Coffman was a newly discovered witness who was a surprise to the defense as well as the State. Three inmates and two corrections officers, a deputy sheriff, O.S.B.I. agent and the bus driver who took Appellant back to the barracks testified that Appellant did not have any indicia of being intoxicated, based on their observations of his actions and his speech. Appellant's self-serving testimony, in and of itself, when weighed against the testimony of the State's witnesses would not have been competent evidence to warrant an instruction of voluntary intoxication. However, Appellant's testimony, when taken together with the testimony of Wasserman and the proffered testimony of Coffman, created a question of fact which should have been presented to the jury to determine the believability of the witnesses. At that point, "the issues of whether the evidence has been rebutted or contradicted are questions of fact for the jury to decide under proper instructions by the Court". 964 P.2d at 902.

¶ 8 This type of fact situation is the very reason this Court should provide objective criteria to aid the trial judge in evaluating the evidence presented to determine if an instruction on the theory of defense should be given.

¶ 9    I also believe further discussion is needed concerning the testimony of Dr. Murphy.    After-the-fact experts are limited in the scope of testimony which is proper.    Dr. Murphy interviewed and evaluated Appellant a substantial period of time after the incident on February 4, 1995.    Therefore, any opinion he might be able to provide to a trier of fact could not properly include an opinion as to whether or not Appellant was intoxicated on the night this murder took place.    The limitations on this type of expert witness testimony provided the basis for our discussion in *Hooks v. State*, 862 P.2d 1273, 1278–79 (Okl. Cr.1993).    Citing to *Moore v. State*, 788 P.2d 387, 399 (Okl.Cr.1990), the Court stated, "[i]n other words, '[a]lthough Section 2704 abolished the "ultimate issue" rule, Sections 2701, 2703, and 2403 should operate to bar admission " 'of opinions which would merely tell the jury what result to reach ...' " ' ". (cites omitted).    Our analysis in *Hooks* is supported by Standard 7–6.6, *American Bar Association Criminal Justice Mental Health Standards*.    That provision provides:

> [e]xpert testimony as to how the development, adaptation, and functioning of the defendant's mental processes may have influenced the defendant's conduct at the time of the offense charged should be admissible.    **Opinion testimony, whether expert or lay, as to whether or not the defendant was criminally responsible at the time of the offense charged should not be admissible.** (emphasis added).

¶ 10    In the commentary discussing this standard, the following analysis is set forth:

> [t]he proper limits to so-called ultimate issue testimony cannot be determined fully in the abstract.    In the context of specific testimony (such as use of the word *appreciate* ), courts must choose between the two important principles reflected in Standard 7–3.9(a):  (1) that expert testimony should be admitted when it is based on a witness's specialized knowledge and will assist the trier of fact; and (2) that expert witnesses should not be permitted to express opinions on "any question requiring a conclusion of law or a moral or social value judgment properly reserved to the court or to the jury."

¶ 11    This analysis is consistent with our opinion in *Davenport v. State*, 806 P.2d 655 (Okl.Cr.1991), wherein we set out the perimeters for expert testimony relating to the child accommodation syndrome.    As we stated in that case, it is proper for the expert to relate to the trier of fact the indicia and characteristics of the syndrome and allow the trier of fact to then determine whether or not the evidence presented supports an application of that concept in the case.    *Id.* at 659–60.

¶ 12    In the present case, once competent evidence of the defense of voluntary intoxication was presented, Dr. Murphy's testimony would have been relevant regarding the results of the tests conducted on Appellant by Dr. Murphy.    These test results would have identified Appellant's condition **at the time of the testing** as it related to Appellant's actions on the night of the murder.    This would allow the trier of fact to make the decision as to whether or not, based on the evidence, Appellant could have formed the intent to kill.    However, Dr. Murphy, as the expert, should not and could not testify as to his opinion regarding whether Appellant had the intent or had the ability to form the intent to kill on February 4, 1995.    Experts, especially those dealing with the art form of psychiatry and psychology, are humans with specialized knowledge, but do not possess the attributes of a deity.    Therefore, their opinion regarding what might have taken place at the time of a crime is speculation based on estimates and guesses within their area of specialized knowledge.    It is for that reason that the content of their opinion should relate only to an interpretation of the tests administered on the defendant which indicate the condition of the defendant at the time of the testing and an explanation of the effect of those findings.    This testimony can then be considered only if the triers of fact find those factors did exist pursuant to the evidence presented in the course of trial at the time of the offense. There cannot be a *carte blanche* authorization of expert testimony without appropriate restrictions being applied to its content.

¶ 13    In this case, it would appear relevant and appropriate for Dr. Murphy to have been allowed to testify regarding the tests

administered, the results of those tests, and the effect alcohol and/or controlled substances could have had on Appellant if the jury found those substances had been ingested by Appellant. Our language in *Hooks* makes this very clear. As we stated:

> [B]ecause a jury might need assistance in understanding and assessing mental disorders which would render an accused insane, expert testimony is routinely admitted when the defense of insanity is raised. When, as in this case, a defendant attempts to elicit expert testimony on the issue of whether he or she possessed the requisite intent to commit the crime in question, such testimony should be excluded. Here, as in *Gabus, supra,* "[n]o special knowledge was needed to understand these facts and draw conclusions from them." *Id.,* 678 P.2d at 256. Anyone who has ever witnessed a temper tantrum or a fight, felt an urge to strike out at another person or attempted to explain away a bad deed could have appreciated the nature of Hooks' actions before, during and after the murder: "[W]here the normal experiences and qualifications of laymen jurors permit them to draw proper conclusions from the facts and circumstances, expert conclusions or opinions are inadmissible." *Id.*

862 P.2d at 1279.

¶14 For the above reasons, I concur in the decision of the Court in this matter.